# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

All funds and credits attributable to or held in Wells Fargo Bank account numbers 7733563139 and 9839475572, in the name Jose P. Saenz, and maintained at the Wells Fargo Bank branch located at 5522 Balboa Ave., San Diego, California 92111.

APPLICATION AND AFFIDAVIT
FOR SEIZURE WARRANT

CASE NUMBER: '08 MJ 0886

I, __Dale N. LaRue__, being duly sworn depose and say:

I am a _____Special Agent with the Drug Enforcement Administration_____, and have reason
           Official Title
to believe in the Southern District of California, there is now certain property, namely:

All funds and credits attributable to or held in Wells Fargo Bank account numbers 7733563139 and 9839475572, in the name Jose P. Saenz, and maintained at the Wells Fargo Bank branch located at 5522 Balboa Ave., San Diego, California 92111,

which accounts are subject to restraint and forfeiture pursuant to 21 U.S.C. §§ 853(a)(1) and 881(a)(6) as money representing proceeds traceable to the distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1), and a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846. The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT, WHICH IS HEREBY INCORPORATED BY REFERENCE AND MADE A PART HEREOF.

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

__MAR 20 2008  5 PM__ at __San Diego, California__
Date/Time issued

Honorable Leo S. Papas

<u>United States Magistrate Judge</u>                    _____
Name and Title of Judicial Officer                        Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

UNITED STATES OF AMERICA      )
                              )  SS
SOUTHERN DISTRICT OF CALIFORNIA )

I, Dale N. LaRue, being duly sworn, state as follows:

1. I am a Special Agent with the Drug Enforcement Administration (DEA), and have been a Special Agent with DEA for approximately 10 years. I am currently assigned to the San Diego Field Division. As a Special Agent, I am a Federal Law Enforcement Officer of the United States who is empowered by law to conduct investigations for offenses pertaining to the Control Substance Act (Title 21, United States Code), the Money Laundering Control Act (Title 18, United States Code), the Bank Secrecy Act (Title 31, United States Code) and other related offenses.

2. Prior to my employment with DEA, I was a police officer with the City of Kent in the State of Washington for two and a half years. During the course of my duties with the DEA and as a police officer, I have participated in the planning and execution of numerous arrests, seizures, and search warrants. I have also received extensive training in financial investigation techniques and have participated as a student in numerous training classes and seminars on money laundering, illegal structuring of financial transactions, and asset forfeitures. I have also spoken to other special agents, police officers, and criminal investigators who are experts in the investigation of narcotics and financial related offenses and have drawn from their experience.

3. I am familiar with the methods narcotic traffickers use to transport and distribute drugs, collect and transfer drug proceeds to hide the nature, true source and ownership of the funds. Based upon my training and experience as well as the corporate knowledge and experience of the other agents and Task Force Officers in my office, with whom I have consulted, I am aware that it is generally a common practice for drug traffickers and money launders to negotiate prices for drugs, to distribute drugs and to collect drug proceeds. I know that drug traffickers and money launderers frequently hire individuals to perform the above-mentioned tasks. I know that drug traffickers and money launderers often use third parties such as businesses, and foreign bank accounts to conceal both the source and disposition of their funds.

## DESCRIPTION OF ACCOUNTS TO BE SEIZED

4. This affidavit is submitted in support of an application for the issuance of a seizure warrant for all funds and credits held in Wells Fargo Bank account numbers 7733563139 and 9839475572 in the name Jose P. Saenz and maintained at the Wells Fargo Bank branch located at 5522 Balboa Ave., San Diego, California 92111.

5. A Wells Fargo Bank account application dated April 2, 2007 lists Jose P. Saenz, Social Security number 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, date of birth 05/26/1980, address - 2825 Red Rock Canyon Rd., Chula Vista, CA 91915, as the sole applicant and signor for Wells Fargo Bank account numbers 7733563139 and 9839475572.

## STATUTORY BASES FOR SEIZURE AND FORFEITURE

6. As set forth below, there is probable cause to believe that the all funds and credits to the above-described bank accounts are subject to restraint and forfeiture pursuant to 21 U.S.C. §§ 853(a)(1) and 881(a)(6) as money representing proceeds traceable to the distribution of controlled substances in violation of 21 U.S.C. § 841(a)(1), and a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846.

7. Section 853(a)(1) of Title 21 provides that:

> [a]ny person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment of more than one year (including 21 U.S.C. §§ 841(a)(1) and 846) shall forfeit to the United States, irrespective of any State law . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation.

8. Section 881(a)(6) of Title 21 provides that the following property shall be subject to forfeiture to the United States and no property right shall exist in them:

> [a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

**OVERVIEW OF THE TARGET SUBJECTS**

9.      The following is a brief description of Jose Jesus Peruch SAENZ, Karl DeLeon MURRAH, and Jesus MACIAS, the target subjects whose drug trafficking activities provide probable cause for the seizure warrant on the target account(s).

      a.      <u>Jose Jesus Peruch SAENZ, aka "G Unit," aka "George"</u> (hereafter "SAENZ") is a pharmacy technician at Galloway Pharmacy located in San Diego, California. SAENZ was in charge of ordering pharmaceuticals, including oxycodone and hydrocodone bitartrate, for Galloway Pharmacy.

      b.      <u>Karl DeLeon MURRAH</u> (hereafter "MURRAH") received large quantities of pharmaceuticals from SAENZ from at least February 2007 through August 2007 and then sold the pharmaceuticals to other individuals for further distribution.

      c.      <u>Jesus MACIAS, aka "Jessie"</u> (hereafter "JESUS") is a pharmacy technician at Galloway Pharmacy. JESUS worked with his brother, Juan Ernesto MACIAS, Jr., to distribute large quantities of pharmaceuticals to others for further distribution.

**FACTS ESTABLISHING PROBABLE CAUSE**

10.     On February 22, 2008, SAENZ was indicted in two separate cases, Criminal Case No. 08CR0509-BEN and Criminal Case No. 08CR0511-BEN, and, in both cases, SAENZ was charged with conspiracy to distribute oxycodone[1] and hydrocodone bitartrate[2] in violation of 21 U.S.C. §§ 846 and 841(a)(1), and multiple counts of distribution of oxycodone and hydrocodone bitartrate in violation 21 U.S.C. § 841(a)(1).

---

[1]     Oxycodone is a potent and potentially addictive opioid analgesic medication synthesized from thebaine. It is a Schedule II controlled substance both as a single agent and in combination with other products such as acetaminophen, ibuprofen, or asprin.

[2]     Hydrocodone is a narcotic which relieves pain by binding to opioid receptors in the brain and spinal cord. Pure hydrocodone, and forms containing more than 15 mg per dosage unit, are Schedule II controlled substances. Controlled purchases and seizures conducted over the course of this investigation to date have involved commercially prepared tablets of hydrocodone bitartrate with acetaminophen, consisting of less than 15 mg hydrocodone per dosage unit and constitute Schedule III controlled substances. All references found herein to "hydrocodone" refer to tablets consisting of hydrocodone bitartrate with acetaminophen.

3

11. On March 6, 2008, SAENZ was arrested and, after he waived his <u>Miranda</u> rights, SAENZ agreed to answer questions. SAENZ stated that he has been employed at Galloway Pharmacy as a pharmacy technician since approximately 2002. SAENZ stated that his primary job duty was ordering medication from various distributors. SAENZ admitted that he stole hydrocodone, oxycodone and Xanax from Galloway Pharmacy, and sold the pharmaceuticals for personal profit. SAENZ stated that MURRAH was his "best customer." SAENZ stated that he has known MURRAH for approximately 4 to 5 years. SAENZ stated that he sold MURRAH primarily hydrocodone, and that MURRAH purchased anywhere from 1,000 to 5,000 hydrocodone tablets 1 to 2 times per week. SAENZ charged MURRAH $0.50 to $1.00 per hydrocodone tablet. SAENZ stated that he occasionally sold MURRAH oxycodone tablets for $12.50 to $15.00 per tablet and Xanax tablets for $0.50 per tablet.

12. During his March 6, 2008 interview, SAENZ stated that the wages he received from his employment at Galloway Pharmacy was the only employment related income that he has received over the past 6 years. SAENZ stated that all of his wages from Galloway were deposited into his San Diego County Credit Union account via electronic transfer. SAENZ stated that funds derived from his drug dealing were deposited into his bank accounts at Wells Fargo Bank and San Diego County Credit Union. SAENZ claimed that half of the amounts in his bank accounts at Wells Fargo Bank consisted of proceeds from the sale of hydrocodone.

### SAENZ Conspired With MURRAH To Distribute Pharmaceuticals

13. In late 2003, the DEA opened an investigation into MURRAH's drug trafficking activities. MURRAH had been identified by a confidential source of information as an ecstasy distributor. During 2003, MURRAH sold ecstasy tablets to an undercover DEA agent (hereafter "the UC") in Lemon Grove, California.

14. On December 7, 2006, the UC met with MURRAH in National City, California. The UC asked MURRAH if he was still moving "X" [ecstasy]. MURRAH said that he moved to "meds" [pharmaceuticals] such as "OxyContin, Vicodin" (brand names for oxycodone and hydrocodone respectively). MURRAH said that one can move a lot of "meds" because the demand was there. MURRAH also said that there was lots of money in that area of business.

15. On January 4, 2007, the UC met with MURRAH at a restaurant in San Diego. MURRAH said that he was currently involved in the distribution of pharmaceuticals such as OxyContin and Vicodin. MURRAH said that he made a lot of money selling pharmaceuticals by transporting large amounts of pharmaceuticals to the East Coast. MURRAH indicated that there was a low supply of OxyContin and that Vicodin was currently in high demand. MURRAH told the UC that he should begin to do his business by doing his homework and starting a line of clients. MURRAH said that a good client base could be found on the local college campuses.

16. In 2007, agents initiated a Title III investigation of MURRAH's drug trafficking activities. Throughout 2007, monitors intercepted over 200 calls and/or text messages regarding pharmaceutical transactions and related financial transactions with SAENZ (MURRAH's primary source of supply for pharmaceuticals) and several customers. Agents conducted approximately three surveillances where SAENZ apparently distributed pharmaceuticals to MURRAH, and approximately 10 surveillances where MURRAH apparently distributed pharmaceuticals to customers. Law enforcement officers seized pharmaceuticals from MURRAH's customers - directly after the customers met with MURRAH - at least three times.

17. On February 3, 2007, agents intercepted a call between MURRAH and Fereydoun Shokrai regarding a pharmaceutical deal. During the call, Shokrai told MURRAH that he needed "30" [hydrocodone tablets]. MURRAH acknowledged and the two agreed to meet before 5:00 p.m. that day. During that evening, agents surveilled MURRAH's meeting with Shokrai in Chula Vista. After the meeting, SDPD Officers stopped Shokrai for speeding and, during the traffic stop, found 30 hydrocodone tablets in a plastic bag on Shokrai's person.

18. On February 21, 2007 at approximately 11:37 a.m., monitors intercepted a call between MURRAH and SAENZ regarding a delivery of "two" [boxes of hydrocodone] to MURRAH in exchange for "eight" [$8,000]. Agents subsequently observed MURRAH and SAENZ meet at Home Depot in Chula Vista, California. At that time, SAENZ was wearing maroon medical scrubs and placed a box of suspected pharmaceuticals into MURRAH's vehicle. Agents also observed SAENZ's girlfriend, Gwenn Abagon SURPRISE, during the meeting.

19. During his March 6, 2008 interview, SAENZ was played a recording of the call on February 21, 2007 between him (SAENZ) and MURRAH. SAENZ confirmed the call was between himself and MURRAH. SAENZ confirmed the call was regarding MURRAH purchasing 12,000 hydrocodone pills from SAENZ for $8,000.

20. On February 22, 2007, wire interceptions indicated that MURRAH planned to meet with his source of supply and receive pharmaceuticals. Agents conducted surveillance and saw SAENZ transfer a box into the trunk of MURRAH's vehicle.

21. On February 28, 2007 at approximately 2:14 p.m., monitors intercepted calls between MURRAH and SAENZ wherein MURRAH asked SAENZ about the availability of "two" [boxes of hydrocodone]. SAENZ replied "yep." MURRAH indicated that he would take both boxes when he got home later that night. Later that day, at approximately 9:35 p.m., agents observed SAENZ drive to MURRAH's residence in Chula Vista, California, and bring a large white bag into MURRAH's residence.

22. On March 7, 2007, at approximately 11:04 a.m., monitors intercepted a call between MURRAH and SAENZ. During the call, MURRAH asked SAENZ whether SAENZ could fill the order [of hydrocodone]. SAENZ told MURRAH that he could fill the order tomorrow. MURRAH confimed that the order was for "two" [boxes of hydrocodone].

23. During his March 6, 2008 interview, SAENZ stated that he and MURRAH commonly referred to oxycodone as "Chica's" or "Bitches" when they communicated via telephone or text messaging.

24. On March 7, 2007, monitors intercepted a call between SAENZ and MURRAH regarding oxycodone. During the call, SAENZ told MURRAH that SAENZ has "Chicas" [bottles of OxyContin]. MURRAH confirmed "oh, you got bitches" [bottles of OxyContin]. MURRAH said that he "ain't paying 3Gs [$3,000] for those things" [bottles of OxyContin]. SAENZ said "no 1250 [$1,250 per bottle of OxyContin], so like 25 [$2,500] total" [for both bottles of OxyContin]. SAENZ further said "it happened like last time. [SAENZ] just came across them." SAENZ said that "opportunity arrives." MURRAH said "okay, just grab them" [the bottles of OxyContin].

25. During his March 6, 2008 interview, SAENZ was played a recording of the call on March 7, 2007 between him (SAENZ) and MURRAH. SAENZ confirmed the conversation was regarding the sale of oxycodone to MURRAH, and that the deal was for MURRAH to purchase 2 bottles of oxycodone (100 pills per bottle) for $2,500.00.

26. On March 7, 2007, at approximately 12:33 p.m., monitors intercepted a call between MURRAH and RAMOND DIZON regarding MURRAH's ability to obtain oxycodone. During the call, MURRAH told DIZON those "bitches are kickin' it" [MURRAH had the bottles of OxyContin ready and waiting for DIZON]. DIZON said "yeah" and told MURRAH to let DIZON "hit him up" when DIZON got home off work. DIZON told MURRAH that he was "ready to kick it" [DIZON was interested in buying the OxyContin to distribute further]. At approximately 12:39 p.m., monitors intercepted a call where DIZON told MURRAH to "bring those girls out tonight" [requesting that MURRAH bring the bottles of OxyContin when MURRAH meets with DIZON later that night]. MURRAH replied "yeah."

27. On March 8, 2007, the UC purchased 2,000 hydrocodone tablets from MURRAH. During this transaction, MURRAH produced a sealed box that was similar to the box from the February 22, 2007 transaction. MURRAH opened the sealed box, which contained several bottles of hydrocodone tablets and gave four of the bottles, each containing 500 tablets for a total of 2,000 tablets, to the UC.

28. On March 8, 2007, at approximately 9:50 p.m., monitors intercepted a call between MURRAH and SAENZ regarding an oxycodone deal. During the call, SAENZ explained that "the girls [oxycodone] are at the pad [SAENZ's residence]."

29. On March 9, 2007 at approximately 11:14 a.m., monitors intercepted a text message where MURRAH told SAENZ: "OK I NEED SOME ZANEX [Xanex] ALSO."

30. On March 9, 2007 at approximately 11:28 a.m., monitors intercepted a text message in which SAENZ asked MURRAH: "HOW MANY [bottles of Xanex do you want]?"

7

31. On March 14, 2007, monitors intercepted a call between MURRAH and SAENZ regarding a pharmaceutical order. During the call, SAENZ told MURRAH that he will most likely have "two" [boxes of hydrocodone] by Friday [March 16, 2007].

32. During his March 6, 2008 interview, SAENZ stated that he and MURRAH commonly referred to hydrocodone as "Lunch" when they communicated via telephone or text messaging.

33. On March 17, 2007, at approximately 10:19 a.m. – and again at 10:21 a.m., 10:22 a.m., 10:23 a.m., 10:25 a.m., 10:27 a.m., 10:30 a.m., 10:32 a.m., 10:34 a.m., 10:40 a.m., 10:45 a.m., 10:51 a.m., 10:56 a.m., 11:02 a.m., and 11:12 a.m. -- monitors intercepted a text message from SAENZ to MURRAH. The text message stated: "LUNCH X2 N THA OTHER R READY 4 U!" [SAENZ had two boxes of hydrocodone bitartrate and an unspecified quantity of Xanax to be picked up by MURRAH].

34. On March 17, 2007, at approximately 12:45 p.m., monitors intercepted a call between MURRAH and SAENZ. During the call, SAENZ told MURRAH that SAENZ "has two [boxes of] lunch [hydrocodone] and the other things, the zs[Xanax]."

35. On March 18, 2007, monitors intercepted a call between MURRAH and SAENZ. During the call, SAENZ asked MURRAH, "Are you going to be available [to meet for a drug transaction] today?" MURRAH replied, "Yeah." SAENZ then said, "I'll call you in, in like two hours, I'll be home."

36. On March 19, 2007, agents searched through the trash at SAENZ's residence and seized three white bottles with Watson labels: Hydrocodone Bitartrate and Acetaminophen - 10 mg-325 - 500 count (including one bottle with a Galloway inventory sticker on the bottom), two shipping labels addressed to SAENZ, bank receipts, and other documents.

37. On March 19, 2007, agents also searched through the trash at MURRAH's residence in Chula Vista. Among the trash at MURRAH's residence, agents found two empty boxes similar to the pharmaceutical boxes previously mentioned from February 22, 2007 and March 8, 2007, and an empty pharmaceutical bottle similar to the bottles purchased by the UC on March 8, 2007 with a Watson label: Hydrocodone Bitartrate and Acetaminophen - 500 count.

38.     On March 27, 2007, monitors intercepted a text message from SAENZ to MURRAH. The text message stated: "ONE LUNCH TIL SAT." [In this text message, SAENZ told MURRAH that he (SAENZ) will have one box of hydrocodone on Saturday, March 31, 2007, at which time SAENZ may obtain more.]  At approximately 11:45 a.m., monitors intercepted a text message from SAENZ to MURRAH. The text message stated: "I GOT SICK. IM STIL A LIL BIT. BUT IM NOT SURE IF UR READY, 1 LUNCH N MAYBE 2 BITCHES!" [In this text message, SAENZ told MURRAH that he (SAENZ) has one box of hydrocodone and possibly two bottles each containing 100 tablets of 80 milligram OxyContin].  At approximately 11:48 a.m., monitors intercepted a text message from MURRAH to SAENZ. The text message stated: "IM READY BUT IM IN VEGAS TIL FRIDAY. CALL." [In this text message, MURRAH confirmed that he was ready to purchase the hydrocodone and OxyContin, but he was in Las Vegas, Nevada, not in San Diego, California.]  At approximately 11:50 a.m., monitors intercepted a text message from SAENZ to MURRAH. The text message stated: "OK, LET JUS DO IT SAT. I'LL HAVE 2 LUNCH BY THEN." [In this text message, SAENZ told MURRAH that he would have two boxes of hydrocodone by Saturday, March 31, 2007.]

39.     On March 31, 2007, monitors intercepted a call between MURRAH and SAENZ. During the call, MURRAH asked SAENZ if he was working that day. SAENZ said that, while he was not working at Galloway Pharamacy, "lunch [hydrocodone] is still available" and that SAENZ would have "lunch" [hydrocodone] by 2:00 p.m. SAENZ asked MURRAH if MURRAH wanted the "two" [boxes of hydrocodone] and MURRAH confirmed that he still wanted the boxes of hydrocodone.

40.     On March 31, 2007 at 11:53 a.m., monitors intercepted a call between MURRAH and Ramond Andrew DIZON. During this call, MURRAH told DIZON that MURRAH had "two bitches at chillin' at two" [MURRAH had two bottles of OxyContin to sell to DIZON priced at $2,000 per bottle]. MURRAH said "two at two" and DIZON replied "alright." [DIZON confirmed that he was interested in buying the two bottles of OxyContin for $2,000 a piece.] MURRAH also told DIZON that MURRAH was "stocking up on lunch [hydrocodone]."

9

41. On March 31, 2007, at approximately 3:38 p.m., monitors intercepted a call between MURRAH and SAENZ. During the call, SAENZ told MURRAH that "lunch [hydrocodone] is ready."

42. On March 31, 2007, at approximately 10:15 p.m., monitors intercepted a call between MURRAH and SAENZ. During the call, MURRAH told SAENZ that MURRAH wanted to meet SAENZ at 11:00 and told SAENZ to bring "the z's and everything" [Xanax and other pharmaceuticals].

43. On June 20, 2007, agents utilized a pole camera to observe SAENZ walk to his vehicle in the Galloway Pharmacy employee parking lot and place a box (similar to the pharmaceutical boxes mentioned above from February 22, 2007, March 8, 2007, and March 19, 2007) into the trunk of his vehicle. Agents followed SAENZ and the vehicle he placed the box into and observed SAENZ drive from Galloway Pharmacy to the target location. SAENZ then parked in the garage of the target location and closed the garage door prior to exiting his vehicle.

44. On July 11, 2007, agents intercepted a text message from SAENZ to MURRAH. The text message stated: "GOT MAIL THANKS." On July 12, 2007, agents intercepted a text message from MURRAH to SAENZ that stated: "SAME THING."

45. On Saturday, July 14, 2007, agents intercepted a call between MURRAH and DIZON where MURRAH said that he was "having lunch" [receiving an order of hydrocodone] on Monday [July 16, 2007]. DIZON told MURRAH that he would "be cool" with "six" [6,000 hydrocodone tablets] and "three" [three bottles of OxyContin]. During the call, MURRAH told DIZON "I got all my e-mails. That's how we're [MURRAH and SAENZ] talking . . . via e-mail through the I phone." Later in the call, DIZON asked MURRAH "if he's [SAENZ] cool or what's up?" MURRAH replies, "yeah, yeah. I'll tell you about it when I see you." MURRAH further said that "he [SAENZ] is still good and active."

46. On July 15, 2007, at approximately 12:59 p.m., monitors intercepted a text message between MURRAH and SAENZ. MURRAH sent the message "CHECK MAIL" to SAENZ.

47. On July 15, 2007, at approximately 8:34 p.m., monitors intercepted a call between MURRAH and SAENZ. During the call, SAENZ told MURRAH that he would be "right there." MURRAH replied that he was at the gas station. In a later call, MURRAH told SAENZ that he was "at the security gate." At approximately 9:25 p.m. on July 15, 2007, agents intercepted a call between

10

MURRAH and DIZON. During the call, MURRAH informed DIZON that he could not meet for dinner because he was too busy "grabbing lunch" [obtaining hydrocodone]. DIZON informed MURRAH that he could always "have lunch" [obtain hydrocodone] after dinner.

48.  On July 25, 2007, at approximately 5:53 p.m., monitors intercepted a text message between MURRAH and SAENZ. SAENZ sent the message, "CHK [check] MAIL" to MURRAH.

49.  On August 17, 2007 at approximately 8:53 p.m., monitors intercepted a call between MURRAH and SAENZ regarding pharmaceuticals. During the call, MURRAH asked SAENZ, "how many boxes [each box containing 12 bottles and each bottle containing 500 tablets of hydrocodone] you got, one or two?" SAENZ replies, "one, I'll be over there [over to MURRAH's house]."

50.  On August 17, 2007 at approximately 11:44 a.m., monitors intercepted a text message from SAENZ to MURRAH that stated: "CHECK MAIL."

51.  On August 17, 2007 at approximately 11:48 a.m., monitors intercepted a text message from MURRAH to SAENZ. In the text message, MURRAH stated: "ALWAYS HUNGRY" [Agents believe that, in this text message, MURRAH informed SAENZ that he (MURRAH) would purchase hydrocodone bitartrate from SAENZ whenever it was available].

**SAENZ Conspired With JESUS MACIAS To Distribute Pharmaceuticals**

52.  In addition to his conspiracy with MURRAH, SAENZ conspired with JESUS MACIAS to divert pharmaceuticals from Galloway Pharmacy for further distribution to others. SAENZ was in charge of ordering pharmaceuticals for Galloway Pharmacy and ordered pharmaceuticals on behalf of JESUS.

53.  On July 18, 2007, at approximately 11:26 a.m., monitors intercepted a text message between SAENZ and JESUS regarding a pharmaceutical order. JESUS sent the text message, "HEY WHAT'S UP WITH THE YELLOWS [hydrocodone]? DID THEY COME IN?" to SAENZ.

54. A confidential source of information for the FBI ("CI")[3/] purchased pharmaceuticals from JESUS and JUAN multiple times. During a consensually recorded conversation on July 24, 2007, JUAN told the CI that his brother [JESUS] was getting the hydrocodone and oxycodone.

55. On July 25, 2007, monitors intercepted a text message between SAENZ and JESUS. In the text message, JESUS stated: "HEY ARE YOU ABLE TO ORDER ME 4 BOTTLES OF THE YELLOWS? THROUGH VALLEY? I'M NOT WORKING FRIDAY AND SAT. THAT IS WHY " to SAENZ. During a subsequent consensually recorded call, JUAN advised the CI that his brother [JESUS] had ordered four bottles of hydrocodone.

56. On September 29, 2007, CI purchased two bottles of OxyContin and eight bottles of hydrocodone from JESUS and JUAN.

61. On October 12, 2007, CI purchased four bottles of OxyContin and four bottles of hydrocodone from JESUS and JUAN.

62. On December 3, 2007, CI purchased three bottles of OxyContin, from JESUS and JUAN.

63. On January 23, 2008, CI purchased two bottles of OxyContin from JESUS and JUAN.

Financial Analysis of SAENZ

64. Agents compared SAENZ's reported earnings on the tax records from the California Employment Development Department ("EDD") for the years 2004 through 2007 with the cumulative deposits into SAENZ's multiple bank accounts for the same years.

65. For 2004, EDD tax records reflect that SAENZ received earnings of $19,422.01, and bank records reflect cumulative deposits of $38,912.79 -- a difference of $18,995.22.

---

[3/] CI-1 pled guilty to felony drug charges in state court and is awaiting sentencing. On April 17, 2007, CI-1 entered into a Cooperation Agreement with the FBI and the San Diego District Attorney's Office. Pursuant to the agreement, CI-1 agreed to plead guilty to felony charges in state court and assist law enforcement in return for a possible reduction in sentencing. On November 26, 2007, the San Diego District Attorney's Office concluded the Cooperation Agreement by telling CI-1 that CI-1 will not receive any further punishment for his/her state felony charges as a result of the cooperation the CI had provided thus far. CI-1 then entered into a second Cooperation Agreement with the FBI and the San Diego District Attorney's Office. Pursuant to the second Cooperation Agreement, CI-1 agreed to continue to assist law enforcement in return for a reduction of his/her felony state charges to a misdemeanor. As of December 5, 2007, CI-1 has been reimbursed $2,100 by the FBI for his/her expenses. The information provided by CI-1 has been corroborated and has proven to be reliable.

66. For 2005, EDD tax records reflect that SAENZ received earnings of $19,684.94, and bank records reflect cumulative deposits of $51,221.81 -- a difference of $31,536.87.

67. For 2006, EDD tax records reflect that SAENZ received earnings of $20,917.95, and bank records reflect cumulative deposits of $70,713.13 -- a difference of $49,795.18.

68. For 2007, EDD tax records reflect that SAENZ receive earnings of $17,097.21, and bank records reflect cumulative deposits of $93,668.49 -- a difference of $76,571.28.

69. In summary, for the years 2004 through 2007, SAENZ's tax records reflect reported cumulative earnings of $77,617.67, while SAENZ's bank records for the same period reflect cumulative deposits of $254,516.22 -- a difference of $176,898.55. Agents believe that the disparity between the amount of SAENZ's reported earnings and the amount of SAENZ's cumulative deposits may be the proceeds of drug trafficking.

**Summary of Deposit Activity for Wells Fargo Bank Account Nos. 7733563139 and 9839475572**

70. SAENZ's bank accounts at Wells Fargo Bank, bank account numbers 7733563139 and 9239475572, were opened on April 2, 2007.

71. Between April 2, 2007 and August 27, 2007, $12,205.05 was deposited into account number 7733563139 at Wells Fargo Bank. Out of the $12,205.05 deposited into account number 7733563139, $9,840.00 were in the form of cash deposits. The difference between total deposits and cash deposits ($2,365.01) consisted entirely of transfers from account 9239475572 (also subject to seizure) and credits (refunds) from items purchased at retail stores.

72. Between April 2, 2007 and August 27, 2007, $16,328.26 was deposited into account number 9839475572 at Wells Fargo Bank Account. Out of the $15,947.00 deposited into account number 9839475572, $9,840.00 of these deposited funds were in the form of cash deposits. The difference between total deposits and cash deposits ($381.26) consisted entirely of transfers from account 7733563139 (also subject to seizure) and credits (refunds) from items purchased at retail stores.

## **CONCLUSION**

73.  It is respectfully submitted that any funds in Wells Fargo Bank account numbers 7733563139 and 9839475572, in the name of Jose P. SAENZ, represent proceeds from the illegal sale of pharmaceuticals including hydrocodone, oxycodone and Xanax in violation of Title 21 U.S.C. §§ 846 and 841(a)(1), and subject the funds in the account to forfeiture to the United States pursuant to 21 U.S.C. §§ 853(a)(1) and 881(a)(6).

74.  By reason of the above, I respectfully request that the Court issue a seizure warrant for all funds and credits attributable to or held in bank account numbers 7733563139 and 9839475572 in the name Jose P. SAENZ, maintained at Wells Fargo Bank. I believe that the issuance of a seizure warrant is necessary because of the fungibility of currency and the ease with which it can be transferred outside the jurisdiction of the court.

_____
DALE N. LARUE
Special Agent DEA

SUBSCRIBED and SWORN to before me on March 20, 2008.

_____
HONORABLE LEO S. PAPAS
United States Magistrate Judge

14